UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CIVIL ACTION NO. 4:15-CV-00122-CRS
CRIMINAL ACTION NO. 4:95-CR-00013-CRS

**DAVID C. CROWE**                                                                       **PETITIONER**

**VS.**

**STACEY MARTIN**
**U.S. Probation officer**                                                          **RESPONDENT**

<u>**FINDINGS OF FACT, CONCLUSIONS OF LAW**</u>
<u>**AND RECOMMENDATION**</u>

<u>**BACKGROUND**</u>

The petitioner, David C. Crowe ("Mr. Crowe"), proceeding *pro se*, has filed a petition for

writ of habeas corpus under 28 U.S.C. § 2241 (DN 1).   Mr. Crowe requests the Court vacate his

money laundering convictions (Counts 15 through 22) because he is actually innocent as a result of

the holding in <u>United States v. Santos</u>, 553 U.S. 507, 128 S.Ct. 2020, 170 L.Ed.2d 912 (2008) (DN

1).   The respondent, United States of America ("United States"), has filed a response (DN 5).

The United States argues that Mr. Crowe's petition should be denied because he is raising the

exact issue that the Court has already resolved when it addressed the § 2241 petition filed by his

wife and codefendant, Martha Crowe ("Ms. Crowe") (DN 5).   Mr. Crowe has not filed a reply

memorandum.

The District Judge referred this matter to the undersigned United States Magistrate Judge,

pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), for rulings on all non-dispositive motions; for

1

appropriate hearings, if necessary; and for findings of fact and recommendations on any dispositive matter (DN 6).   The undersigned concludes that an evidentiary hearing is not necessary because the file and records of the case conclusively show Mr. Crowe is not entitled to relief on his claim.   This matter is ripe for determination.


### FINDINGS OF FACT

Mr. Crowe founded the corporation Gold Unlimited, Inc. ("Gold").   United States v. Gold Unlimited, Inc., 177 F.3d 472, 475 (6th Cir. 1999).   Eager participants seeking galactic profits flocked to this advertised "Get Rich Quick" program.   Id.   However, only Gold and the Crowes quickly got rich, so authorities intervened.   Id.   The United States pursued criminal charges, contending that the Crowes and Gold operated an illegal pyramid scheme.   Id.

Following a three week trial, a jury convicted the Crowes and Gold of seven counts of mail fraud (Counts 1 through 7), one count of money laundering conspiracy (Count 15), and seven counts of money laundering (Counts 16 through 22) (DN 117, Order in Case No. 4:95-CR-00013-JHM).   The jury found the Crowes and Gold not guilty on five counts of sale of unregistered securities (Counts 8 through 12), one count of fraud in the purchase and sale of securities (Count 13), and one count of fraud in the offer and sale of securities (DN 117, Order in Case No. 4:95-CR-00013).   On December 12, 1996, the Court sentenced Ms. Crowe to 121 months imprisonment with three years of supervised release, and sentenced Mr. Crowe to 135 months imprisonment with three years of supervised release (DN 147 & 148, Judgments in Case No. 4:95-CR-00013)).   The Crowes and Gold filed notices of appeal (DN 152, 153, & 154, Case No. 4:95-CR-00013).

2

The Court released the Crowes on bond pending their date for voluntary surrender to begin service of their sentences (DN 150, 151, Case No. 4:95-CR-00013-JHM).   However, they failed to surrender and instead fled the country.   They were re-arrested in July of 2001, and returned to Kentucky (DN 298 at 5, Case No. 4:95-CR-00013).   The Crows were indicted and subsequently entered guilty pleas to a charge of failure to appear for which they were sentenced to serve additional time (Id.).   Notably, the Crowes' decision to flee resulted in the dismissal of their direct appeals of their convictions under the fugitive entitlement doctrine.   Gold Unlimited, Inc., 177 F.3d at 478.   In sum, the Crowes forfeited their right to challenge any aspect of the trial proceedings on direct appeal because of their decision to flee the jurisdiction.   Id.   Gold unsuccessfully pursued an appeal.   Id. at 475-489.

In May 2002, Mr. and Ms. Crowe each filed a substantially identical motion to vacate, set aside or correct sentence ("motion to vacate") pursuant to 28 U.S.C. § 2255 (DN 215 & 216, Case No. 4:95-CR-00013).   The Court dismissed both motions as untimely and denied certificates of appealability (DN 254 & 255, Memorandum Opinion and Order in Case No. 4:95-CR-00013).

In 2010, Mr. and Ms. Crowe each filed a petition for writ of habeas corpus under 28 U.S.C. § 2241, in their respective jurisdictions of incarceration, relying on 28 U.S.C. § 2255(e)'s savings clause.   Again, the Crowes argued identical new claims.   Among other grounds, they relied on the Supreme Court's holding in United States v. Santos, 553 U.S. 507 (2008), to argue factual innocence of the money laundering charges.

In April of 2011, the United States District Court for the Southern District of Georgia denied Mr. Crowe's § 2241 petition.   Crowe v. Haynes, No. CV210-130, 2011 WL 1559223, at *1 (S.D.GA. Apr. 25, 2011) (adopting the Magistrate Judge's recommendation in Crowe v.

3

Haynes, No. CV210-130, 2011 WL 1558419, at *1-3 (S.D. GA. Jan. 12, 2011)).   The district court concluded Mr. Crowe did not meet the requirements of the savings clause in § 2255(e) because of Eleventh Circuit precedent that foreclosed applications of *Santos* outside of its particular context.   Id.   Crowe did not appeal the district court's ruling.

Meanwhile, in September 2012, this Court denied Ms. Crowe's § 2241 petition because she did not meet the requirements of the savings clause in § 2255(e) (DN 48, 49, Memorandum Opinion & Order in Case No. 4:11-CV-00089).   However, Ms. Crowe moved for reconsideration and, in February 2012, this Court vacated its earlier decision and granted Ms. Crowe's § 2241 petition (DN 53, 54, Memorandum Opinion & Order in Case No. 4:11-CV-00089).

Meanwhile, on March 8, 2013, Mr. Crowe filed before this Court a motion to vacate under § 2255 (DN 291, Case No. 4:95-CR-00013).   Essentially, Mr. Crowe argued he should be allowed to file a second or successive § 2255 motion to raise a claim that his judgment is subject to collateral attack because the Court vacated the money laundering counts and ordered a resentencing in Ms. Crowe's case (DN 291 at # 184, Case No. 4:95-CR-00013).   The Court construed Mr. Crowe's motion to vacate as a second or successive motion and, therefore, transferred it to the Sixth Circuit pursuant to 28 U.S.C. § 1631 (DN 292, Case No. 4:95-CR-00013).

In an order entered October 18, 2013, the Sixth Circuit addressed Mr. Crowe's claim that his current § 2255 motion should not be construed as a second or successive motion, because his claim was not "ripe" until this Court vacated the money laundering counts in his wife's case (DN 294, Order Case No. 4:95-CR-00013).   The Sixth Circuit acknowledged that the statutory bar on filing second petitions does not apply to an application brought when a claim first ripens, or when

4

the factual predicate arose after the filing the first motion (DN 294, Order Case No. 4:95-CR-00013).   In pertinent part the Sixth Circuit order reads:

> Crowe's ripeness argument attempts to skirt the legal ground upon which it is based.  Crowe purports to argue that his wife's recent judgment is his sole, independent basis for relief.  However, there is no authority for the proposition that a vacated judgment in a co-defendant's case provides stand-alone grounds to vacate judgments of other co-defendants.  While Crowe cites case law stating that divergent judgments in a case may establish the requisite factual predicate to toll a statute of limitations, the same cannot be said to provide substantive grounds for relief, void of any underlying legal basis.  Contrary to Crowe's assertions, because the district court relied on *Santos* and its interpretation of § 1956 when vacating his wife's judgment, *Crowe[ v.Keffer]*, [No. 4:11CV-89-S,] 2013 WL 614714, at *3 [(W.D.Ky. Feb. 19, 2013), the basis for Crowe receiving the same relief necessarily also relies on *Santos*.
>
> Under *Santos*, the term "proceeds" as used in § 1956 means "gross receipts," except where money transfers are "inherent in the scheme"; the latter situation creates a merger problem where the money transfers used to establish money laundering convictions were essential to the conduct forming the mail fraud convictions. *Id.* at *2 (citing *United States v. Wilkes*, 662 F.3d 524, 549 (9th Cir. 2011); *Garland v. Roy*, 615 F.3d 391, 395-96 (5th Cir. 2010)). Thus, the events giving rise to any *Santos* claim—the statute and indictment in this case—were apparent before Crowe was convicted.  No intervening amendment to § 1956 created this argument for Crowe, and the term "proceeds" remained undefined at the time of his initial § 2255 petition.  *See* 18 U.S.C. § 1956 (1996), *amended by* 18 U.S.C. § 1956(c)(9) (2009); *Santos*, 553 U.S. at 511.  Nothing prevented Crowe from arguing for any particular statutory construction in his first petition.  Even if *Santos* announced a novel interpretation, Crowe's claim did not "ripen" upon its pronouncement.  Rather, Crowe could have raised a similar claim in his first § 2255 motion, and the court would have ruled on its merits because the factual predicate for it existed at the time.  Accordingly, Crowe's proposed § 2255 motion is second or successive and he must satisfy either of the two statutory requirements for filing such a motion.

> To obtain this court's authorization, Crowe must make a prima facie showing that the proposed motion relies on one of two statutory grounds: (1) newly discovered evidence, which tends to prove him innocent of the offense of conviction, such that no reasonable factfinder would have found him guilty; or (2) a new rule of constitutional law that was made retroactive to cases on collateral review by the Supreme Court. *See* 28 U.S.C. §§ 2244(b)(3), 2255(h).
>
> Not every new Supreme Court case justifies a grant of authorization to file a second or successive § 2255 motion. Because *Santos* created a rule of statutory construction for 18 U.S.C. § 1956, and not a rule of constitutional law, it does not satisfy the requirement. See *Paulino v. United States*, 352 F.3d 1056, 1059 n.2 (6th Cir. 2003). Nor can Martha Crowe's recent judgment properly be construed as newly discovered evidence.
>
> We express no view on Crowe's § 2241 motion in the Southern District of Georgia.
>
> Because Crowe's proposed § 2255 motion is second or successive and he has not satisfied either of the statutory requirements to obtain authorization to file a second or successive motion under § 2255, his motions are denied.

(DN 294 at # 203-204, Order Case No. 4:95-CR-00013). Thus, in an order entered on October 18, 2013, the Sixth Circuit denied Crowe's motion for an order authorizing the district court to consider a second or successive motion to vacate.

Meanwhile, the United States moved for relief from the order granting Ms. Crowe's § 2241 petition. Upon reconsideration this Court concluded that the initial decision denying Ms. Crowe's petition reached the correct result (DN 72, 73 Memorandum Opinion & Order in Case No. 4:11-CV-00089). Therefore, in an order entered June 25, 2014, this Court vacated the February 2012 decision and denied Ms. Crowe's § 2241 petition (DN 73, Order in Case No. 4:11-CV-00089).

In a superseding memorandum opinion, entered on August 25, 2014, this Court responded to Ms. Crowe's second motion for reconsideration (DN 75, Case No. 4:11-CV-00089).   In pertinent part, this Court found:

> [T]here is no basis for vacating [Ms.] Crowe's money laundering convictions when the analysis is properly focused on the "concrete details of the particular 'scheme to defraud,' rather than on whether mail fraud generally requires payment of the kind implicated in *Santos*."   The court will expound upon its analysis at some length below.   However, in a nutshell, the court has concluded that the counts of conviction for money laundering in this case do not pose a merger problem, as the jury convicted Crowe of laundering profits of Crowe's Ponzi scheme.   As established by *Santos* and its progeny, profits consist of what remains after expenses of the Ponzi scheme are paid.   *Santos*, 128 S.Ct. at 2027.   Where it is proven that profits are laundered, there will be no possibility of "double counting" transactions in proceeds which are essential to the operation of the scheme.   *Id.*

(DN 75, Memorandum Opinion at 3, Case No. 4:11-CV-00089).   Therefore, this Court concluded Ms. Crowe failed to meet her burden, under the savings clause in § 2255(e), to establish "actual innocence" of the money laundering charges (DN 75, Memorandum Opinion at 21, Case No. 4:11-CV-00089).   On the same date, the Court issued an order and judgment that vacated the previous rulings (DNs 48/49, 53/54, and 72/73) and denied and dismissed Ms. Crowe's § 2241 petition with prejudice (DN 76, Case No. 4:11-CV-00089).

Approximately one year and one month later, Mr. Crowe filed his § 2241 petition which requests the Court vacate his convictions for money laundering (Counts 15 through 22) and resentence him on the fraud convictions (Counts 1 through 7) (DN 1).   The United States responds by arguing the petition should be denied because Mr. Crowe has raised the exact issue that this Court already resolved when it denied Ms. Crowe's § 2241 petition (DN 5).

7

## CONCLUSIONS OF LAW

### Actual Innocence

Mr. Crowe already filed, and the Court denied, an earlier motion to vacate under 28 U.S.C. § 2255, and the Sixth Circuit has not granted him leave to file a successive petition.   Therefore, like his wife before him, Mr. Crowe seeks relief under the "savings clause" of § 2255(e) which allows a person to challenge the legality of a conviction or sentence under § 2241.   Specifically, § 2255(e) provides:

> An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

Applying the terms of the statute to the circumstances herein, Mr. Crowe must demonstrate "actual innocence" which is not cognizable in a second or successive § 2255 motion in order to invoke the savings clause.   Wooten v. Cauley, 677 F.3d 303, 306-307 (6th Cir. 2012).   Notably, the Sixth Circuit has derived its understanding of "actual innocence" from the holding in Bousley v. United States, 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).   Wooten, 677 F.3d at 307.   Specifically, the Sixth Circuit explained:

> *Bousley* held that "[t]o establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him ... [and] that 'actual innocence' means factual innocence, not mere legal insufficiency."   523 U.S. at 623–24, 118 S.Ct. 1604 (internal quotation marks and citations omitted).   One way to establish factual innocence is to show an "intervening change in the law that establishes [the petitioner's] actual innocence."   *Peterman*, 249 F.3d at 462.   This may be achieved by demonstrating (1) the existence of a new interpretation of statutory law, (2) which was

8

issued after the petitioner had a meaningful time to incorporate the new interpretation into his direct appeals or subsequent motions, (3) is retroactive, and (4) applies to the merits of the petition to make it more likely than not that no reasonable juror would have convicted him.

Wooten, 677 F.3d at 307-308.   Since Mr. Crowe urges that an intervening change in the law establishes his actual innocence the four prong test set forth above will be applied to address his claim.

Crowe argues that the decision in United States v. Santos, 553 U.S. 507 (2008) establishes his innocence to the money laundering charges in Counts 15 through 22 (DN 1, Petition at #6-7). More specifically, Mr. Crowe asserts:

The record shows a merger problem within the meaning of Santos [sic] because the same payout of proceeds as returns from investors formed the basis of the mail fraud convictions, as well as proved the elements of the money laundering charge that the Petitioner transacted if [sic?] proceeds from the underlying predicate unlawful activity.

(DN 1, Petition at #6-7).   Thus, Mr. Crowe is raising an argument that the Court already considered to a fair-thee-well in connection with Ms. Crowe's § 2241 petition.   Notably, Mr. Crowe offers nothing new to show this Court why it should not deny his petition for the same reasons that it denied Ms. Crowe's petition.

The Santos Decision

In Santos, the United States Supreme Court addressed a challenge to Santos' convictions for operating an illegal lottery and for money laundering.   553 U.S. 509-510.   More specifically, in a motion to vacate under 28 U.S.C. § 2255, Santos argued that the term "proceeds" in 18 U.S.C. § 1956 means profits, not gross receipts, and that the United States had not proved that the transactions underlying his convictions involved the profits of his illegal gambling business.   Id.

9

at 509-524.   The Supreme Court's 4-1-4 decision in <u>Santos</u> laid out three different ways to interpret "proceeds."

Writing for a four-Justice plurality, Justice Scalia observed that the dictionary definitions of "proceeds," the term's use throughout Title 18, and the statutory context of § 1956 all failed to resolve the matter, because each interpretation was as plausible as the other.   <u>Id.</u> at 511-514. Justice Scalia therefore invoked the rule of lenity and adopted the more defendant-friendly definition, "proceeds" means profits.   <u>Id.</u> at 513-514.   Thus, the plurality concluded that "proceeds" always means profits under § 1956.   <u>Id.</u>

The plurality noted that applying the rule of lenity was particularly appropriate because defining proceeds as gross receipts would create a "merger problem" for a number of predicate offenses under § 1956.   <u>Id.</u> at 514-519.   "[N]early every violation of" a number of predicate offenses listed in § 1956(f)(3), it turns out, also violate "the money-laundering statute," and money laundering sometimes "radically increases" the statutory maximum sentence compared to the merged offense.   <u>Id.</u> at 515-516.   In <u>Santos</u> itself, for example, operating an illegal lottery had a statutory maximum of five years, while a § 1956 conviction raised the statutory maximum to 20 years.   <i>See</i> <u>id.</u> at 516; 18 U.S.C. §§ 1955(a), 1956(a)(1).

Justice Alito, writing for four Justices in dissent, reached the opposite conclusion, noting that the primary definition of "proceeds" was gross receipts, that this interpretation made sense in the context of this and related statutes and that accordingly § 1956 always encompasses gross receipts.   <u>Id.</u> at 533-534 (Alito, J., dissenting).   In Justice Alito's view, the rule of lenity had no place in the analysis because the context in which "proceeds" appeared suggested that it referred to gross receipts.   <u>Id.</u> at 532-535, 548.   Acknowledging that his interpretation created a merger

problem, Justice Alito responded that the answer was not to alter the statutory meaning of "proceeds" but to resolve any such problems at sentencing or, if necessary, through amendments to the sentencing guidelines.   Id. at 546-548.

Justice Stevens, writing for himself, concurred in the judgment in favor of Santos, but he rejected the always-the-one or always-the-other approaches offered by his colleagues.   Id. at 524-528 (Stevens, J., concurring in the judgment).   As Justice Stevens viewed it, the meaning of "proceeds" in § 1956 varied depending on the underlying predicate offense.   Id.   Thus, while "proceeds" meant profits if the laundered funds derived from operating an illegal lottery, it might mean gross receipts if the laundered funds derived from distributing cocaine.   Id. at 524-526. Two factors drove Justice Stevens' assessment of how to apply the provision in various settings and his ultimate decision to apply a profits definition to Santos.   Id. at 526-527.   One, defining "proceeds" as profits when the predicate offense is operating an illegal lottery created a "merger problem" that "radically increase[d] the sentence for that crime" and led to a "perverse result" that "Congress could not have intended." Id. at 528.   Two, nothing in the legislative history of § 1956 suggested that Congress was aware of this problem and yet still chose to treat "proceeds" as gross receipts when the laundered funds derive from operating an illegal lottery.   Id. at 526.   Under these circumstances, Justice Stevens concluded, the rule of lenity tipped the scale in favor of defining "proceeds" as profits when the predicate offense is operating an illegal lottery.   Id. at 528 n. 7.

The concurrence by Justice Stevens rested on a narrower ground than Justice Scalia's plurality opinion.   Id. at 523.   Therefore, Justice Stevens' concurrence stated the rule of law to be

11

applied in <u>Santos</u>.   <u>Id.</u> (citing <u>Marks v. United States</u>, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).

      The Sixth Circuit in <u>United States v. Kratt</u>, explained the holding in <u>Santos</u> as follows:

> "[P]roceeds" does not always mean profits, as Justice Scalia concluded; it means profits only when the § 1956 predicate offense creates a merger problem that leads to a radical increase in the statutory maximum sentence and only when nothing in the legislative history suggests that Congress intended such an increase. Whenever a predicate offense satisfies this narrow rule, the Justices in the plurality would hold "proceeds" means profits as well, because they would define "proceeds" as profits for every predicate offense.

579 F.3d 558, 562 (6th Cir. 2009).   The Sixth Circuit in <u>Kratt</u> also made clear the term "proceeds" has the same meaning under both § 1956 and § 1957, as both statutes were enacted as part of the Money Laundering Control Act of 1986 and cover the same subject in a common way.   <u>Id.</u> at 560-561.

      In <u>Jamieson v. United States</u>, the Sixth Circuit held that there was no merger problem when mail fraud (§1341) constituted the predicate offense under either a § 1956 or § 1957 charge.   692 F.3d 435, 436, 440-442 (6th Cir. 2012).   The court determined that no risk of an increased sentence existed for the defendant in that instance, as the predicate offense of mail fraud carried a maximum sentence greater or equal to the money laundering offenses.   <u>Id.</u> at 441-442.

      The holding in <u>Jamieson</u> does not apply here because the maximum sentence for mail fraud was 20 years at the time of Jamieson's conviction in 2003, but was only 5 years at the time of Mr. Crowe's conviction in 1996.   Therefore, in this instance, unlike <u>Jamieson</u>, the Court is faced with a potential merger problem if the mailings charged in Counts 1 through 7 are indistinct from the

money laundering transactions in counts 15 through 22 such that proof of one crime would necessarily establish the second crime.

The line of cases in which courts have found a merger problem under <u>Santos</u> all involved payments of various sorts which were financial transactions charged as both money laundering and mail or wire fraud.   For example, in <u>United States v. Crosgrove</u>, the Sixth Circuit observed:

> Most notably, the payments Crosgrove received for his services as an attorney and claims adjuster, which the Government states are the only basis for upholding Crosgrove's conviction for conspiracy to commit money laundering, are also listed in the indictment as overt acts in furtherance of the mail/wire fraud conspiracy.  *See United States v. Moreland*, 622 F.3d 1147, 1166 (9th Cir.2010). The indictment itself, therefore, reveals the Government's position that the conspiracy to commit mail/wire fraud would, without any additional action by Crosgrove, also constitute a money laundering conspiracy.
>
> Crosgrove's charges of conspiracy to commit mail/wire fraud and conspiracy to commit money laundering merge, and the money laundering charge carries a far heavier statutory maximum than the mail/wire fraud charge.  Further, we have found nothing in the legislative history to indicate that Congress intended this result for the predicate crime of mail/wire fraud unrelated to narcotics trafficking.  Therefore, the profits definition of "proceeds" must apply to this case.  Much as payments to the runners in an illegal lottery operation are essential to the operation of a lottery, and therefore are transactions involving receipts rather than profits, payments to a "claims adjuster" are essential to the operation of a fraudulent insurance scheme.  Just as someone has to collect money from lottery participants in order for the lottery to exist, someone must at least purport to represent the claims department of an insurance operation in order for the operation to appear legitimate.
>
> It is certainly possible that a conspirator serving as a claims adjuster could receive profits of the predicate offense rather than just proceeds, but that is not this case, at least not as presented by the Government.  Crosgrove's pay was not linked to the amount of fees collected, the value of claims denied, the net receipts after settlement payments, or any other metric that would indicate he was

> extracting a share of AREA/Noble's profits. There may be an argument that someone in Crosgrove's position could receive such a high fixed payment that, even if it were characterized as a "salary," it obviously represented profits of the enterprise. However, no such evidence was presented in this case, and the monthly payments Crosgrove received (in amounts of $2,500, $3,000, and $3,500) do not appear exceptional and cannot be construed as anything more than payments for services rendered. Because the Government did not show that these payments were made from profits, the conspiracy to commit money laundering charge cannot be upheld.

637 F.3d 646, 655-656 (6th Cir. 2011); *accord,* United States v. Moreland, 622 F.3d 1147, 1166 (9th Cir. 2010) (wire transfers common to the wire fraud and money laundering counts of indictment); United States v. Van Alstyne, 584 F.3d 803, 815 (9th Cir. 2009) ("all of the particular counts of mail fraud for which Van Alstyne was convicted involved transmissions of checks to investors, not the misrepresentations with which the investments were first induced.").

In United States v. Bush, the Ninth Circuit found no merger problem. 626 F.3d 527, 537 (9th Cir. 2010). In reaching this conclusion the Ninth Circuit noted that "[t]he circumstances surrounding the securities, wire and mail-fraud convictions were all distinct from the money laundering, thus alleviating any merger concerns...[T]he mail-fraud convictions (Counts 15-17) have no connection to the transfers – rather the mail fraud was based on Bush's promotional activities and the sending of false documents to clients." Id.

The Fourth Circuit, in United States v. Simmons, was faced with a Santos challenge to wire fraud and money laundering convictions in connection with the perpetration of a Ponzi scheme. 737 F.3d 319, 321, 325 (4th Cir. 2013). Similarly to the other Santos-interpreting cases,

14

Simmons's payments to investors were essential to both Simmons's fraud and money laundering offenses:

> The superseding indictment characterized the wire fraud offense as including transfers to "wire ponzi payment to investors and to their intermediaries in other states" – the very transactions that the Government later prosecuted as money laundering.

Id. at 326.   The Simmons court likened the case before it to the Van Alstyne case, noting that the payment of purported returns to early investors were "inherent" to the defendant's underlying scheme to defraud.   The Simmons court concluded:

> Given this case's similarity to *Santos*, we must decline the Government's invitation to divide Simmons's Ponzi scheme into a successive series of past, present, and future frauds.   Rather, *Santos* requires that we hold that Simmons's Ponzi scheme, like the lottery scheme in *Santos*, represented a single, ongoing enterprise that the defendant could sustain only by making limited payouts.

Id. at 327.

Assessment of the Case Law

The indictment in this case charged seven mailings for the purpose of executing the Crowes' scheme to defraud.   Counts 1 through 4 each alleged a mailing to an identified individual or business on January 13, 1995.   Counts 5 and 6 each alleged a mailing to an identified individual on January 18, 1995.   Count 7 alleged a mailing on March 7, 1995, to a business.

The indictment charged money laundering under § 1957 in Counts 16 through 22.   Each of the seven counts identified a deposit of money into a Liberty Bank account.   The deposits were made on February 15, 21, and 24 of 1995, and March 6 and 9 of 1995.   Count 15 alleged conspiracy to commit money laundering, reciting 264 overt acts which were deposits made into the Liberty Bank account between February 1 and March 13, 1995.

The money laundering counts alleged that the defendants engaged in and conspired to engage in monetary transactions in criminally derived property that was of a value greater than $10,000.00, in violation of 18 U.S.C. §§ 1957 and 1956(h) respectively.   The term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense.   18 U.S.C. § 1957(f)(2).   In this case, the criminal offense from which the proceeds were allegedly derived was mail fraud.

In the mail fraud counts, the indictment charges specific mailings in furtherance of a scheme to defraud.   In the money laundering counts, the indictment charges specific bank deposits.   The United States has represented that the mailings were commission checks sent to investors in furtherance of the scheme to defraud.   The money laundering counts charge numerous deposits into a Liberty Bank account on dates which do not readily correspond to the dates of the mailings.   Thus, on its face, it does not appear that the acts of mailing and the acts of depositing bear any relationship to one another.   The checks mailed to investors and the deposit of funds into a bank account are clearly distinct transactions.   By contrast, in Crosgrove and Moreland, the transactions were charged both as fraud and money laundering.

The case at bar is most similar to the Van Alstyne case involving a scheme to sell interests in bogus oil and gas partnerships to targeted individuals.   584 F.3d at 807-809.   The investors received distribution checks shortly after investing, to induce them to further invest, but the sums they received were essentially the investors' own principal.   Id.   Transfers of funds into an account of the limited partnerships was charged as money laundering.   Id. at 814-816.

16

The Ninth Circuit in <u>Van Alstyne</u> observed that:

> Mail fraud has two elements: "(1) having devised or intending to devise a scheme to defraud (or to perform specified fraudulent acts), and (2) use of the mail for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts)." *Carter v. United States*, 530 U.S. 255, 261, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000); *see also Bridge v. Phoenix Bond & Indem. Co.*, —— U.S. —— ——, 128 S.Ct. 2131, 2138, 170 L.Ed.2d 1012 (2008).   The Supreme Court has emphasized that 18 U.S.C. § 1341 prohibits "the 'scheme to defraud' rather than the completed fraud....," *Neder v. United States*, 527 U.S. 1, 25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), and that a mailing need only be "incident to an essential part of the scheme" to satisfy the second element.   *Bridge*, 128 S.Ct. at 2138.

584 F.3d at 8114-815.   The <u>Van Alstyne</u> court went on to explain that issuing checks to investors supposedly representing substantial returns on their investments inspired investors to send more money which could then, in turn, be used to pay more investors.   The court noted that this was a central component of the scheme to defraud:

> The very nature of the scheme thus required some payments to investors for it to be at all successful.   In sending the January and June distribution checks funded by the money transfer that was charged as money laundering, Van Alstyne "enter[ed] into a transaction paying the expenses of his illegal activity," *Santos*, 128 S.Ct. at 2027 (plurality opinion).   Convicting Van Alstyne of money laundering for the bank transfers inherent in the "scheme" central to the mail fraud charges thus presents a "merger" problem closely parallel to the one that underlay the majority result in *Santos*.
>
> Moreover, all of the particular counts of mail fraud for which Van Alstyne was convicted involved transmissions of checks to investors, not the misrepresentations with which the investments were first induced.   The government is therefore quite wrong to suggest that the mail fraud and money laundering crimes are separate in the mail fraud context because "the fraud was complete once the victim's [sic] were induced to part with their money based on defendant's misrepresentations."   To the contrary, it appears that

17

> many, if not all, of the fraud counts of which Van Alstyne was
> convicted could have been charged as money laundering as well,
> sharply illustrating the "merger" problem.

Van Alstyne, 584 F.3d at 815.   However, the court in Van Alstyne found there was no merger with regard to one transaction where the entire investment was refunded to an investor.   Id.   The court found that the transfer was not in furtherance of nor inherent in the scheme because the funds returned to the investor would not be available to lull other investors into maintaining their investment.   Id. at 815-816.   The Ninth Circuit noted that at the same time the return of funds to the investor was "intended to 'promote the carrying on,' 18 U.S.C. § 1956(a)(1)(A)(i), of the 'scheme' at the heart of the mail fraud counts, by discouraging detection of the scheme."   Id. at 816.   Inasmuch as the mail fraud "scheme" and money laundering elements were distinct with regard to this specific money laundering count, the Ninth Circuit affirmed that count.   Id.

Here, the indictment against Mr. Crowe charged a scheme to defraud encompassing the period from November 1, 1991 through March 13, 1995, and charging seven particular mailings from January 13, 1995 through May 7, 1995.   The money laundering conspiracy encompassed a shorter period from November 1, 1993 through March 13, 1995, specifying 264 overt acts, each constituting a bank deposit made between February 1, 1995 and March 13, 1995.   The seven substantive money laundering counts charged bank deposits made between February 15, 1995 and March 9, 1995.

Mr. Crowe was charged with acts of mailing to investors in furtherance of the fraudulent scheme described in the mail fraud counts.   The acts of depositing monies from investors, charged as money laundering, could potentially constitute acts inherent in the scheme were it not for the United States' proof that the deposits far exceeded the costs, after taking into account the payouts

to investors.   The United States established that $17,000,000 more went into the account as deposits than was paid out as expenses of running the scheme.   This sum was, in fact profit, as defined by <u>Santos</u>, that is, what remained from the gross receipts after subtraction of the sums paid out to investors as "returns," in furtherance of the Pyramid scheme.

Receipts vs. Profits

In contrast to the facts of the other cited cases, the indictment against Mr. Crowe charges the laundering of $15,035,298.19 in deposit transactions occurring in February and March of 1995 immediately before the scheme was shut down.   The United States proved at trial that 96,000 participants had paid $43,000,000.00 to Gold over the course of the scheme, and Gold had disbursed $25,000,000.00 in commissions by March of 1995.   <u>United States v. Gold Unlimited, Inc.</u>, 177 F.3d 472, 477 (6th Cir. 1999).   Thus, the laundered sums charged in the indictment were profits, as they were nearly the sum that remained at the end of the scheme, after accounting for the payouts of commissions to investors.

In <u>Santos</u>, the Supreme Court noted that an illegal scheme remains an illegal scheme for each moment of its existence, and the United States may select the period of time for which it can most readily establish that "the receipts from the charged unlawful activity exceeded the costs fairly attributable to it."   <u>Santos</u>, 553 U.S. at 520-521.   Thus, in prosecuting its case against Mr. Crowe, the United States was free to select the instances for which profitability was the clearest. <u>Id.</u>   The United States did so in this case by charging deposits made at the end point in the life of the scheme and proving the amount of payments from investors and the amount of the returns that they received.

19

Unquestionably, the <u>Santos</u> case established that payments to participants or investors as returns on investment, to induce further participation or to ensure the continuation of the illegal scheme, are transactions in receipts, not profits.   Thus, a money laundering conviction based upon transactions in receipts cannot stand where such a conviction would increase the sentence for what is essentially one course of conduct.   However, the undersigned reads <u>Santos</u> as also approving the converse proposition: that profits in the hands of the perpetrator of an illegal scheme are not shielded from prosecution for money laundering, as laundering the profits of a such a crime is not necessary and essential to the fraudulent scheme.   <u>Id.</u>

Assuming for the sake of argument that Mr. Crowe contends the $15 million seized in 1995 constituted the "assets" of Gold and not profits of an illegal Pyramid scheme, there is nothing in the case law requiring acts of money laundering to occur exclusively outside the time frame of the scheme to be profits, although such facts were found in a number of cases to distinguish certain payments to investors as not essential to the fraudulent scheme.   The evidence presented at trial demonstrated that the United States shut the scheme down in March of 1995 and proved the amounts taken in, disbursed as commissions, and remaining at that point in time.   Clearly, the United States established the amounts remaining were profits after the payment of commissions as opposed to assets of Gold that were seized before commissions were paid on current receipts.

The United States presented evidence demonstrating that Gold's program, that purportedly was predicated on the marketing of gold and jewelry, only resulted in a gross profit of $552,620.00 from the sales of gold coin, in contrast to the intake of $43,000,000.00 and the disbursement of but $25,000,000.00 in commissions.   <u>Gold Unlimited, Inc.</u>, 177 F.3d at 481.   Thus, the United States successfully established an illegal pyramid scheme, rather than a legal multi-level marketing

20

scheme as claimed by Mr. Crowe, through evidence that showed investors earned commissions not by the product sales, but through recruitment of other investors.

The undersigned agrees with the premise that deposits of receipts from a Ponzi scheme used to pay commissions or other expenses can be necessary to perpetuation of the scheme. However, in this case, the United States proved that profits of Mr. Crowe's Ponzi scheme were laundered in 1995.   Thus, there was no merger of charges in Mr. Crowe's case.   In sum, this case stands in contrast to Santos in which "the Government did not try to prove, and respondents [did] not admit[], that they laundered criminal profits."   128 S.Ct. at 523-524.   Here, there is no question that the United States charged and proved only an amount constituting profits laundered at the end of the scheme in 1995.

Conclusion

In summary, the Van Alstyne case counsels the court to focus on the concrete details of the particular scheme to defraud, rather than on whether mail fraud generally requires payment of the kind implicated in Santos.   584 F.3d at 815-816.   The undersigned's conclusion meets the stated purpose of, and stands in harmony with, Santos and the cases seeking to apply the Santos principle, including Van Alstyne.   While it is clear that Santos intended to prevent a "radical increase" in sentences for crimes already "duly considered and appropriately punished elsewhere in the Criminal Code," (Santos, 553 U.S. at 528), it is equally clear that Santos did not intend that mail fraud charges necessarily swallow up legitimate charges of money laundering.   There are decisions that view the prosecution of money laundering in Ponzi scheme cases as difficult, if not impossible, to justify under Santos.   However, the undersigned does not believe this case falls under that principle for the reasons outlined above.

Under the directive in <u>Van Alstyne</u>, a money laundering conviction cannot stand where the acts of money laundering – in this case, deposits into a bank account used, in part, to pay out proceeds to investors in a Ponzi scheme – are simultaneously necessary and essential to the fraudulent scheme, unless it is proven that the proceeds involved in those money laundering transactions were profits of the criminal activity.   As there is such proof in this case, the petition for habeas corpus is without merit.

Ultimately, Mr. Crowe has failed to meet his burden to establish "actual innocence" of the money laundering charges.   <u>Wooten</u>, 677 F.3d at 303.   Therefore, Mr. Crowe's petition for habeas corpus should be denied.

## Certificate of Appealability

When the Court rejects a claim on the merits, the movant must demonstrate that reasonable jurists would find the Court's assessment of the constitutional claim debatable or wrong.   <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).   The undersigned acknowledges that there is a split among the circuits regarding Justice Stevens' concurring opinion in <u>Santos</u>.   The Fourth, Eighth, and Eleventh Circuits have held that in light of Justice Stevens' concurance, <u>Santos</u> defines "proceeds" as "profits" only when courts are presented with the particular facts of <u>Santos</u>, where the petitioners were convicted of laundering money from the "unlawful activity" of running an illegal gambling operation.   <u>United States v. Spencer</u>, 592 F.3d 866, 879–80, n. 4 (8th Cir. 2010); <u>United States v. Demarest</u>, 570 F.3d 1232, 1242 (11th Cir. 2009); <i>see also</i> <u>United States v. Howard</u>, 309 F. App'x. 760, 771 (4th Cir. 2009) (unpublished).   By contrast, the Third and Seventh Circuits have concluded that Justice Stevens' concurrence indicates "proceeds" must be defined as "profits" any time the legislative history of the money-laundering statute does not affirmatively

indicate otherwise.  United States v. Lee, 558 F.3d 638, 643 (7th Cir. 2009); United States v. Yusuf, 536 F.3d 178, 186 n. 12 (3d Cir. 2008).   The Ninth Circuit and, likely, the First Circuit have held that "proceeds" must be defined as "profits" any time the "merger problem" articulated in Santos would result if "proceeds" is defined as "gross receipts."   United States v. Van Alstyne, 584 F.3d 803, 814 (9th Cir. 2009); United States v. Bucci, 582 F.3d 108, 123–24 (1st Cir. 2009) (suggesting this interpretation in dicta).   Similar to both steps in Justice Stevens' rule, the Sixth Circuit has held, "'proceeds' does not always mean profits, as Justice Scalia concluded; it means profits only when the § 1956 predicate offense creates a merger problem that *leads to a radical increase* in the statutory maximum sentence *and* only when nothing in the legislative history suggests that Congress intended such an increase."   United States v. Kratt, 579 F.3d 558, 562 (6th Cir. 2009) (emphasis added).   By contrast, the Fifth Circuit has concluded that Justice Stevens joined the plurality's rule in cases where defining "proceeds" as "gross receipts" would result in the "perverse result" of the "merger problem," and when applications of the statute did not involve such a perverse result he would start from the presumption that "proceeds" should be defined as "gross receipts," but he would look to the legislative history of the money-laundering statute, 18 U.S.C. § 1956, to challenge this presumption, and only if he could locate adequate legislative history to rebut this presumption, indicating that "proceeds" should be defined as "profits," would he conclude that Congress meant for the narrower definition to apply. Garland v. Roy, 615 F.3d 391, 402 (5th Cir. 2010) (citing Santos, 553 U.S. at 528 n. 7).   In light of these varying interpretations of Justice Stevens' concurrence, the undersigned believes that jurists of reason may reach a different conclusion regarding whether Mr. Crowe met his burden to establish "actual

innocence" of the money laundering charges.   Therefore, the undersigned recommends that a Certificate of Appealability be granted.

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that Mr. Crowe's petition for writ of habeas corpus under 28 U.S.C. § 2241 (DN 1) be **DENIED.**   Further, the undersigned recommends that a Certificate of Appealability be **GRANTED** as to Mr. Crowe's petition for writ of habeas corpus.

## NOTICE

Therefore, under the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C) and Fed.R.Civ.P. 72(b), the Magistrate Judge files these findings and recommendations with the Court and a copy shall forthwith be electronically transmitted or mailed to all parties.   Within fourteen (14) days after being served with a copy, any party may serve and file written objections to such findings and recommendations as provided by the Court.   If a party has objections, such objections must be timely filed or further appeal is waived.   Thomas v. Arn, 728 F.2d 813 (6th Cir.), aff'd, U.S. 140 (1984).

Copies:      David C. Crowe, *pro se*
                Counsel of Record